**In re RIVERWOOD LA PLACE ASSOCIATES, LLC, Debtor.**

**Bankruptcy No. 897–89417–346.**

United States Bankruptcy Court, E.D. New York.

May 6, 1999.

J.H. Hall, and E.M. Flint, Shaw, Licitra, Bohner, Esernio & Schwartz, P.C., Garden City, N.Y., for debtor Riverwood LaPlace Associates, LLC ("Riverwood" or "Debtor").

T.A. Berkowitz, and M. Healy, Farrell Fritz, P.C., Uniondale, N.Y., for Creditor CFSC Capital Corp. XXVII ("CFSC").

A.L. Rosen, Rosen & Slome, LLP, Garden City, N.Y., for Creditor Breslin Group ("Breslin Group").

M.L. Hamroff, Moritt, Hock & Hamroff, LLP, Garden City, N.Y., for Creditor The Great Atlantic & Pacific Tea Company, Inc. and Super Fresh/Sav–A–Center, Inc. (collectively "A & P").

M. Dollinger, Dollinger, Gonski & Grossman, Carle Place, N.Y., for Creditor Oakland Realty ("Oakland").

S.Y. Yang, Assistant United States Trustee, Office of the United States Trustee, Garden City, New York. ("Trustee").

## MEMORANDUM OF DECISION DENYING DEBTOR'S MOTION AND AMENDMENT TO MOTION OBJECTING TO CLAIM OF CFSC

FRANCIS G. CONRAD, Bankruptcy Judge.*

The issue before us[1] arose during the course of the confirmation hearing held February 12, 1999, ("Confirmation Hearing") on Debtor's Fifth Amended Chapter 11 Plan of Reorganization ("Plan A") and secured creditor CFSC's competing Chapter 11 Plan of Reorganization ("Plan B") (collectively "Plans"). In addition to the Confirmation Hearing, the day's calendar contained a plethora of motions, responsive, in some respects to the Plans; a cadre of attorneys appeared in support of these motions.

Among the motions was Debtor's Motion Seeking a Determination and Allowance of and to Reclassify the Claim of CFSC and to Value the Property Pursuant to Sections 502, 506 and 105 of the Bankruptcy Code[2] ("Motion"). Debtor filed an amendment to the Motion under section 502(d) alleging that CFSC had received a fraudulent conveyance in connection with certain financial transactions ("Amendment"). Having chosen this Motion as the first to be argued, to the chagrin of some counsel, our ruling from the bench denying the Motion and Amendment in all respects, sent the players packing to the hallways to discuss the next strategic step. After several hours of pacing the hall and conferring with the necessary parties/investors, Debtor's Fifth Amended Plan was withdrawn and CFSC's Plan was confirmed. We write to elaborate the bench ruling and, in particular, our concern over Riverwood's proposal of the fraudulent conveyance theory so late in the day.

## BACKGROUND

Riverwood LaPlace owns and operates a shopping center in LaPlace, Louisiana ("Property"). The Property is Riverwood's sole asset and is a viable ongoing

---

\* Sitting by Special Designation in the Eastern District of New York.

1. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(3) and the General Reference to the Court under Rule 4 of the General Rules of the United States District Court for the Eastern District of New York. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (H) and (L).

This Memorandum of Decision constitutes Findings of Fact and Conclusions of Law under Fed.R.Civ.P. 52 as made applicable by Fed.R.Bankr.P. 7052.

2. All citations are to the Bankruptcy Code, Title 11, United States Code, unless otherwise noted.

concern. CFSC is the Debtor's secured creditor, holding a non-recourse mortgage in the principal amount of $61.65 million encumbering the Property. The mortgage is evidence by a Collateral Mortgage, Assignment of Leases and Rents, and Security Agreement dated March 15, 1994 ("Mortgage"). The Mortgage secures Riverwood's indebtedness to CFSC in the total original principal amount of $61 million, plus interest and other charges, representing the sums owned by the Debtor under a Promissory Note dated March 15, 1994 ("Note") in the original principal amount of $3.65 million and under five Guaranty Agreements ("Guaranty Agreements") under which the Debtor unconditionally guaranteed the obligations of five related entities aggregating $58 million.[3] The Guaranty Agreements, by their express terms, entitled CFSC to pursue its rights and remedies under these agreements notwithstanding the availability of other remedies under any other guaranty of or security for Riverwood's obligations under the loan agreements with CFSC.

By September 21, 1995, Riverwood had defaulted on its obligations. On March 27, 1996, CFSC commenced a foreclosure action against the Property in the United States District Court for the Eastern District of Louisiana ("Louisiana Action"). A "Keeper," the equivalent of a Receiver, was appointed to collect the rents generated from the Property. CFSC also commenced a foreclosure action in the Supreme Court, State of New York, County of Nassau against the five related entities, seeking to foreclose five mortgages the affiliates had given to secure their obligations to CFSC ("New York Action"). These were the obligations Riverwood had guaranteed under the Guaranty Agreements and that were secured by the Mortgage. The New York Action was automatically stayed as to Riverwood, but it continued against the affiliates. Later, in the New York Action, CFSC was awarded summary judgment and the counterclaims and affirmative defenses of the affiliates were dismissed.

## DISCUSSION

A determination on the Motion was pivotal to the success of either of the Plans. A starting point for the analysis is to place a value on the property. For purposes of other litigation before us, the parties had stipulated to a fair market value of $5,169,-500.00. Under section 506(a) of the Bankruptcy Code, a secured claim is secured to the extent of the value of the creditor's interest in the estate's interest in the property. Based on this earlier accorded value, the Motion seeks to fix the secured claim of CFSC at $5,169,500.00 and asked us to determine the appropriate default rate of interest for the resulting unsecured portion of the claim. Believing that this cannot be completed without having valued the other shopping centers included in the guarantees, Debtor asked us, without benefit of financial information or appraisals, to value those centers. Casting this request in bankruptcy terms, Debtor asked us to marshal its assets.

Marshaling is an equitable concept designed to prevent a senior creditor from pouncing on the rights of a junior lienor. See *Meyer v. United States*, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963); *Chittenden Trust Company v. Sebert Lumber, Co. (In re Vermont Toy Works, Inc.)*, 82 B.R. 258 (Bankr.D.Vt. 1987), *rev'd* on other grounds, 135 B.R. 762 (D.Vt.1991). Three elements are neces-

---

**3.** Each entity that executed a Guaranty Agreement is related to Riverwood and are owned and controlled by Wilbur F. Breslin ("Breslin"). Breslin is the managing member of Riverwood. Each Guaranty was executed on March 15, 1994 and guarantees $16,830,-000.00 from Busy Bee Associates, L.P.; $18,-750,000.00 from Bay Harbour Associates, L.P.; $10,870,000.00 from Huntington Square Associates, L.P.; $10,750,000.00 from Rochester Associates, L.P.; and, $800,000.00 from Verleye & Jericho Associates, L.P. Under the terms of a settlement reached at the Confirmation Hearing, in the near future, all of these entities are to be filed as pre-packaged bankruptcies.

sary for the marshaling doctrine to be invoked:

1). a senior creditor with rights to two or more funds in which a common debtor has an interest; 2). a common debtor with an interest in two funds; and, 3). a junior creditor with a lien on or interest in only one of the funds in which the common debtor has an interest.

*Vermont Toy Works,* 82 B.R. at 290 (citations omitted.)

■ For the simple reason that CFSC is the only scheduled secured creditor of this Debtor, the requirements of marshaling are not satisfied. The request to marshal was denied and we need not look at the doctrine any further.

■ In a bizarre procedural posture, Debtor's novel argument for disallowing CFSC's claim surfaced in the Amendment. We say novel only insofar as its timing. Debtor argues that CFSC is the recipient of a fraudulent conveyance. The Amendment argues that the Notes and Riverwood Guarantees were incurred by Debtor without fair consideration and had the effect of rendering Debtor insolvent.[4] This potential claim of the Debtor was never listed in Debtor's schedules, was never disclosed in any of Debtor's five preceding Disclosure Statements, and was never the subject of an adversary proceeding. Debtor nevertheless argues that under section 502(d) of the Bankruptcy Code CFSC's claim must be disallowed, because the holder of the claim is a transferee of a voidable transfer under section 544 of the Bankruptcy Code.

■ We reject this argument, however, for a myriad of reasons. This potential claim against CFSC was not listed in Debtor's schedules as required by section 521(1) of the Bankruptcy Code. There is a duty to schedule, for the benefit of creditors and the court all interests and property rights. *In re Hannan,* 127 F.2d 894 (7th Cir.1942); Section 521(1), Bankruptcy Code. Indeed, Debtor has an ongoing obligation to schedule assets and liabilities and to provide a statement of financial affairs. "Disclosure is important, . . . not only to [CFSC] as an adversary and as a creditor, but to the other creditors and to the bankruptcy court. Here, the 'silence' . . . as they say in the vernacular, 'is deafening.' " *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir.1988), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). At the time of filing of the petition, CFSC was viewed as a creditor, not as a potential asset. That remained the case until the filing of the Amendment two years after the petition, after five proposed Debtor plans and the date of confirmation.

■ If Debtor truly believed that CFSC received a fraudulent conveyance, then it was incumbent upon Debtor to amend its schedules and file an adversary proceeding. A fraudulent conveyance cannot be recovered through a motion, or at the last moment. Basic bankruptcy practice rec-

4. The fact that this claim of fraudulent conveyance was never revealed before January 29, 1999, the day the Amendment was filed, does not necessarily mean that such a claim does not exist. The Affidavit of Martin Schackner, Chief Financial Officer of Breslin Realty Development Corp., sworn to January 28, 1999, Exhibit B to the Amendment paints a picture of Debtor's financial condition that at the time of the loan could be viewed as precarious in relation to the dollar amount of the debt being incurred.

THE COURT: . . . At the time this debt was incurred, and again I'm assuming this to be true, the debtor owed no antecedent debt to CFSC, and pursuant to these guarantees, the debtor released affiliated borrowers from any claims arising from any payments made by the debtor on these guarantees. And, again, I assume that to be correct for today, but I'm not so sure that's going to be a true fact in a full-blown adversary proceeding. These releases, then, would have deprived the debtor of valuable rights.

Assuming all those facts are true, we would have to only come to the unmistakable conclusion that the debtor was insolvent and, therefore, I think that debtor's motion makes out a prima facie case of fraudulent conveyance. However, there are a lot of problems in reference to this motion. . . .

*Transcript of February 12, 1999, pp. 34–35.*

ognizes that to recover money or property, an adversary proceeding must be commenced. *See In re Winterroth,* 97 B.R. 454, 455 (Bankr.C.D.Ill.1988); Fed. R.Bankr.P. 7001. Debtor's procedural failure prevents this theory from being prosecuted before us. *See H.R.P. Auto Center, Inc.,* 130 B.R. 247, 253 (Bankr.N.D.Ohio 1991).

## CONCLUSION

Based upon the pleadings that were properly before us at the Hearing, the Motion and Amendment are denied. Debtor concealed this claim and while we are hesitant to analogize this to litigation by ambush, it comes close. Due Process required that we deny Debtor's Motion and Amendment.

A bench order has previously been entered.